RICHARD HOPKINS *vs.* ARCHIBALD CAREY et ux., et al.

Under the act of 1839, commonly known as " The married woman's law," property purchased by a husband, and by him procured to be conveyed to his wife, after marriage, may be subjected to the payment of his debts.   If the property come to the wife from the husband, or through him, or by his means, it all amounts to the same thing.

A title to property cannot be vested in a wife on her husband's credit, any more than it can by his money ; and, therefore, where a husband procured a

conveyance of property to be made to his wife, he executing his own notes, with personal security, for the greater portion of the purchase-money, under the expectation that payment would be made out of the wife's means; he having paid the residue in property apparently his own, but alleged by him in his answer to have been purchased with the separate funds of the wife, there being no proof in support of the answer; it was *held*, that the husband had a resulting trust in the property, which could be enforced for the benefit of his creditors.

Money of the wife, which came to the hands of the husband before the passage of the act of 1839, belonged to him, unless some special reason intervened to prevent it.

If money of the wife be invested by the husband, with his own, in property which is conveyed to her, she will thereby acquire an interest in the property only to the extent of the investment of her means.

An equitable title to land, which is not complete and perfect, and especially an imperfect equity of a complicated character, is not the subject of sale under execution. The creditor must resort to a court of chancery, in order to reach such an equity of his debtor.

ON appeal from the superior chancery court; Hon. Stephen Cocke, chancellor.

The facts of the case are sufficiently stated in the opinion of the court.

*W. S. Wilson*, for appellees.

Mr. Chief Justice SHARKEY delivered the opinion of the court.

The object of this bill is to remove a cloud from title, or to subject certain property to the satisfaction of a judgment. In 1838, Moses Hopkins recovered a judgment against Carey and others, on which execution issued and was returned *nulla bona*. The complainant claims to be assignee of that judgment. The bill charges the insolvency of the parties, and that in 1839 Carey purchased a lot from one Ely, at the price of $4800; that he paid $1000 of this sum by procuring Vertner to convey to Ely a certain other lot, the legal title to which was in Vertner, though it had been purchased of him by Randolph & Carey, as partners in the practice of law, in discharge of professional services rendered by them to Vertner. For the balance of the purchase-money on the lot purchased by Carey

from Ely, Carey gave his two promissory notes with respondent Archer and others as sureties, and procured the title to be made by Ely to Mrs. Carey, with a view, as it is said, to defraud creditors, she not having paid any thing, and not having any separate property. On the second note due from Carey he paid the sum of $400, which was raised by his having procured the money from bank. In October, 1841, Carey and wife conveyed the lot to Archer, who is charged with notice. In October, 1842, complainant had an execution on his judgment levied on the property, as the property of Carey, and became the purchaser. Archer, however, continued in possession until 1843, when the property was sold under execution against him by the marshal, and purchased by Connelly with notice.

The answer of Archer denies that complainant is a *bond fide* assignee; states that he was induced to sign the notes as surety, on the representation of Carey that the purchase was to be made in good faith on account of his wife, and the money to be paid by her, with means to be derived from her father in Virginia, and from other resources which she had in the District of Columbia, and denies any knowledge of a fraudulent intent on the part of Carey. Respondent knew nothing, at that time, of the conveyance of the lots by Vertner to Ely, but has since learned that the conveyance was made as stated in the bill, and insists that if a trust resulted to any one, it was to Randolph and Carey jointly. In 1841, respondent becoming uneasy about his liability to Ely, as Carey was about to leave the State, took the conveyance from Carey and wife to secure himself, with an understanding that the lot should be appropriated in discharge of the debt. That respondent was sued in the United States court for a large balance due on the notes and judgment recovered, and by his direction the marshal levied the execution on the lot, and Connelly became the purchaser at the marshal's sale. Denies that he knew of any fraudulent intent on the part of Carey, or that he knew the property was to be held in trust for him, or that he knew of any payments made by him, or that he knew of the existence of Hopkins' judgment.

The answer of Connelly states the recovery of the judgments against Archer as surety, and that he became the purchaser at the marshal's sale, and has paid the purchase-money; denies that he knew the property belonged to Carey; admits that he knew Hopkins' execution had been levied on the property; denies the validity of the assignment to complainant, and states that it is fictitious, and made only because M. O. Hopkins was sheriff of the county, and therefore could not levy and purchase under his own execution, but was present at the marshal's sale, and bid for the property without setting up any pretence of title.

The answer of Carey and wife states the purchase of the lot from Ely in 1839, for $5800. In payment he transferred to Ely ten shares of stock in the Bank of Port Gibson, delivered to him a deed for another lot or lots, executed by Vertner and wife, valued at $1000, and for the balance executed the two notes with Archer and others as sureties, one for $2400, and the other for $1400; that it was a *bonâ fide* transaction for the benefit of his wife, made with her consent, "and with the expectation of being paid for with moneys to be received by her from her father for her own separate use;" that the ten shares of bank stock transferred to Ely, was part of twenty shares purchased by respondent, for which he paid $900 in money belonging to his wife; that Vertner was paid for his lots by the extinguishment of a note given by him to Randolph & Carey, for about $1000 for money loaned; that the payment of $400 made on one of the notes in May or June, 1841, was of the money of his wife; denies the charge of fraud.

By an amended answer, Archer states that he has heard and believes it to be true, that the father of Mrs. Carey, by deed of trust, has secured to her separate use, certain stocks in the banks in Alexandria, and has caused the dividends to be punctually paid to her.

There was no proof taken in the cause, and the chancellor dismissed the bill, and complainant has appealed. The case must be determined on the facts as they stand admitted by the pleadings.

The case seems to present two questions.  1.  Had Carey any interest in the lot?  And 2, if he had, can it be reached by this proceeding?

The act of 1839 authorizes married women to acquire real ·and personal estate, and to hold the same, by bequest, demise, gift, purchase, or distribution, provided the same does not come from her husband after coverture.   The legal title was in Mrs. Carey ; it was made to her after the passage of the act.   But did it come from her husband, or through him, or by his means, for it all amounts to the same thing?   The answer states that it was paid for by ten shares of bank stock, by the transfer of another lot derived from Vertner, and by two notes of Carey and others, one for $2400, and the other for $1400, with the expectation that the payments would be made out of the separate funds of the wife, to be received from her father. This will not do ; the expectation of the purchaser can have no influence on the transaction.   To secure the wife in her title, the property should have been paid for out of her separate funds.   The true consideration of the sale was the notes of the husband.   A title cannot be vested in the wife on the husband's credit, any more than *it* can by his money.   That Ely did not sell on the credit of the separate property of the wife, or expect to receive payment from that source, is most evident. He took the notes of the husband with personal security. But it is said in the answer, that the ten shares of bank stock had been purchased with the money of the wife ; there is no proof of this.   The married woman's law was passed in 1839, and this transaction took place during that year.   The money of the wife which came to the hands of the husband before the passage of that act, belonged to the husband, unless some special reason intervened to prevent it.   It does not appear when this money of the wife was received, or from what source received.   But suppose it were true that so much of her money was invested in the purchase, that would only give her an interest to the extent of the investment.   We cannot doubt but that Carey had an interest in the lot, and it remains to inquire, in the next place, whether it can be reached by this proceeding.

Hopkins v. Carey et ux., et al.

That Carey's interest was liable for the satisfaction of this judgment we entertain no doubt, though we are not prepared to say it was liable to be sold under execution at law. He held a resulting trust, and the farthest we have gone in holding equities liable to be sold under execution, is the decision in *Thompson* v. *Wheatley*, 5 S. & M. 499. That case decides that one who has purchased real estate, and has taken a bond for title on payment of the purchase-money, after full and complete payment of the same, has such an interest as may be sold under execution. Then nothing but the naked legal title remained in the vendor; the whole beneficial interest was in the vendee, and he had a right to demand the legal title whenever he pleased. But even in that case it was held that the party must go into equity to perfect his title. Now we are asked to go a step further, and to hold that an equity more complicated in its character, is also the subject of sale under execution. We are not inclined to extend the doctrine. In the case of *Goodwin* v. *Anderson*, 5 S. & M. 730, we decided that a mere equitable interest, which was not complete and perfect, was not the subject of sale under execution. On the authority of this case the complainant derived no title by his purchase at the sheriff's sale. We should here remark that the charge of fraud has been denied by the answer, but perhaps that is not a very material question, as the legal title never was in Carey; he never had any thing more than a resulting trust. But though it be true that complainant acquired no title by his purchase at the sheriff's sale, does it thence follow that he is not entitled to relief? Not at all; the bill is in the alternative; it prays, if his title should not be sustained, that the lot may be sold and his judgment satisfied. In the case of *Goodwin* v. *Anderson*, above cited, we decided that, although an equity could not be seized at law, yet it was bound in equity by the judgment, as it would have been at law if it had been a legal title. The judgment creditor has a right to insist upon the execution of the trust, for the satisfaction of his judgment, just as the debtor would have a right to enforce it for his own benefit. On this principle the complainant has a right to have the lot sold for his benefit,

and the chancellor should so have decreed. It has been insisted that a trust resulted to Randolph & Carey who furnished part of the purchase-money. That question we shall not decide; it may be so, and it but furnishes an additional reason for remanding the cause for further consideration. Or it may be that the complainant has lost his lien. The case has not been very fully presented, and we only decide the principles applicable to it as far as they have been presented by the pleadings.

Decree reversed, and cause remanded.